[Cite as *Portsmouth Ins. Agency v. Med. Mut. of Ohio*, 2012-Ohio-2046.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

PORTSMOUTH INSURANCE AGENCY,            :

     Plaintiff-Appellee/            :     Case No.   10CA3405
    Cross-Appellant,
       :
   vs.
           :
MEDICAL MUTUAL OF OHIO,            DECISION AND JUDGMENT ENTRY

             :

     Defendant-Appellant/
   Cross-Appellee.            :
_____

APPEARANCES:

COUNSEL FOR APPELLANT/
 CROSS-APPELLEE:    David L. Day, 380 South Fifth Street, Suite 3, Columbus, Ohio 43215

COUNSEL FOR APPELLEE/CROSS-APPELLANT:  David J. Wigham, John H. Schaeffer, and
Andrew P. Lycans, Critchfield, Critchfield & Johnston, LTD, 225 North Market Street, P.O. Box
599, Wooster, Ohio 44691
_____

CIVIL CASE FROM COMMON PLEAS COURT
DATE JOURNALIZED: 5-3-12

ABELE, P.J.

{¶ 1} This is an appeal from a Scioto County Common Pleas Court judgment in favor of

Portsmouth Insurance Agency, plaintiff below and appellee herein, following a jury trial.   The jury

determined that appellee did not breach an indemnity agreement that it entered into with Medical

Mutual of Ohio, defendant below and appellant herein.

{¶ 2} Appellant assigns the following errors for review:

FIRST ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN DENYING MEDICAL MUTUAL'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN DENYING MEDICAL MUTUAL'S MOTION FOR NEW TRIAL."

THIRD ASSIGNMENT OF ERROR:

"THE JURY'S VERDICT IN FAVOR OF PORTSMOUTH AND AGAINST MEDICAL MUTUAL WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 3} Appellee/Cross-Appellant raises the following cross-assignment of error:

"THE TRIAL COURT ERRED IN OVERRULING [PLAINTIFF,] PORTSMOUTH INSURANCE AGENCY'S, MOTION FOR DIRECTED VERDICT MADE AT THE END OF THE [DEFENDANT], MEDICAL MUTUAL'S, PRESENTATION OF ITS CASE."

I

OVERVIEW

{¶ 4} The present appeal involves appellee's obligation under an indemnity agreement to compensate appellant for attorney fees that appellant incurred when defending a separate lawsuit. The separate lawsuit began after appellant allegedly wrongfully terminated Luther and Donna Alley's health insurance policy (the Alley litigation). The Alley litigation involved appellant's, appellee's, and appellee's agent's (Todd Skaggs) liability to the Alleys. The parties eventually settled the matter. The lawsuit that gives rise to the instant appeal arises out of (1) appellee's

declaratory judgment complaint that requested the court to declare the parties rights and obligations under the indemnity agreement and (2) appellant's counterclaim for breach of contract.

II

BACKGROUND

A

THE AGENCY AGREEMENT

{¶ 5} On November 9, 2000, appellee and appellant entered into an agency agreement. Under the agreement, appellee warranted "that it will comply with [appellant]'s rules and regulations relating to the completion and submission of applications by groups for coverage." Appellee further warranted "that it will diligently and to the best of its ability ensure that the representations set forth by any applicant in the health statements solicited are true and correct. Agent further warrants that it will fully inform the applicant that [appellant] will rely solely upon these representations, conditionally accepting or contracting with applicant; that the subsequent discovery by [appellant] of material facts known by applicant and either not disclosed or misrepresented on the application can result in the rescission or cancellation by [appellant] of any contract entered into in reliance thereon * * *."

{¶ 6} The agreement also contained an indemnity provision that states: "The Agent agrees to indemnify and save [appellant] harmless from all loss, expense, cost and liability resulting from unauthorized acts or transactions by said Agent or any other persons engaged or acting on the Agent's behalf."

B

THE ALLEYS' HEALTH INSURANCE APPLICATION

{¶ 7} On December 13, 2001, Luther and Donna Alley applied for health insurance coverage with appellant through appellee's agent, Todd Skaggs. The application that Skaggs submitted on the Alleys' behalf contained a medical health questionnaire (MHQ) that asked the applicant whether the applicant, the applicant's spouse, or any listed dependent has "at any time been treated for or diagnosed as having any of the following [88 listed] conditions?" The Alleys' application answered "yes" to two conditions: (1) high blood pressure; and (2) hysterectomy. As further explanation of the conditions, the application stated that Mrs. Alley had an uncomplicated hysterectomy approximately 12 years ago, and that Mr. Alley has high blood pressure and takes Dyazide. The application additionally stated that Mr. Alley checks his blood pressure at home and contained Mr. Alley's three blood pressure readings from December, November, and October 2001.

{¶ 8} The application further recites certain terms and conditions, one of which states: "I represent and warrant that I have read this Health and Life Insurance Application, and understand each of the questions and the answers to each of the questions I have given are complete and true to the best of my knowledge. I agree that any misrepresentation or concealment on this Application will void my policy at the discretion of MMO and/or MLI. I further agree that if a policy is issued, it will be issued by MMO and/or MLI (if applicable) in full reliance and in consideration of the information, answers, and statements contained herein." The Alleys' signatures appear on the same page as this paragraph.

{¶ 9} Appellant subsequently issued a policy. Appellant later observed more medical claims on the Alleys' behalf than it had expected, and decided to investigate.

C

THE INVESTIGATION

{¶ 10} Appellant obtained the Alleys' medical records and discovered that Mr. Alley had medical conditions (high cholesterol, coronary artery disease, gout, high blood pressure, and prostatitis) that existed before December 13, 2001 that were not disclosed on the application's MHQ section.

{¶ 11} Appellant subsequently contacted the Alleys to inquire about the medical conditions that had not been listed on the MHQ.   On January 12, 2004, Medical Mutual Underwriting Analyst Edward A. Stewart and Medical Mutual Supervisor of Financial Investigations Christopher J. Ferrara spoke with Mr. Alley and first questioned him about some cardiac catheterization procedures that he had undergone.   Mr. Alley advised them that his most recent procedure had been performed in 2002.   Stewart then informed Mr. Alley that the medical records show that Dr. Barry George had performed a cardiac catheterization in February 2001.   Mr. Alley stated that although Dr. George told him he had a 60% blockage, Dr. Bradley, who performed a cardiac catheterization in 2002, informed Mr. Alley that Mr. Alley did not have a 60% blockage and that the doctor "doubted if it was even 50% blockage."

{¶ 12} Ferrara asked Mr. Alley why he answered "no" to the question on the MHQ regarding coronary artery disease.   Mr. Alley stated that he was "not really sure."   Mr. Alley advised Ferrara and Stewart that he did not "think he had a heart problem, because Dr. George said 60% blockage, then Dr. Bradley said doubtful if even a 50% blockage, so he didn't think there was a problem when he filled out his application."   Stewart "challenged" Mr. Alley's response by pointing out that Dr. George performed the cardiac catheterization before Mr. Alley enrolled with MMO and that Dr. Bradley performed the procedure after Mr. Alley's enrollment.   Mr. Alley

responded by stating that he did not "trust the word of Dr. George, that he thought it was just a money making thing. [Mr. Alley] stated he had a cardiac cath[eterization] done 11 years ago by Dr. Dreitcher, and Dreitcher told him his heart was fine." Stewart then asked Mr. Alley why he had so many heart catheterizations. Mr. Alley stated that "he has had little chest pains over the years, and a brother who had bypass surgery, so he was checked out to make sure he was OK."

{¶ 13} Stewart and Ferrara next questioned Mr. Alley about his cholesterol problem. They informed Mr. Alley that the medical records show in October 2001, Dr. Mullins noted that Mr. Alley has high cholesterol and "gave him low cholesterol sheets." Mr. Alley responded that "Dr. Mullins never told him the numbers, he didn't tell him he had high cholesterol, he just told him to watch his diet."

{¶ 14} Stewart questioned Mr. Alley why the prostate condition was not reported on the application. Stewart informed Mr. Alley that the medical records show that Mr. Alley had two flare-ups in 2000 and that the doctor gave him antibiotic for it. Mr. Alley stated that the doctor prescribed the antibiotic for a yeast infection and not for a prostate flare-up.

{¶ 15} Stewart next inquired why Mr. Alley did not report that he had suffered from gout. Mr. Alley responded that "if he had been having a problem with it, he would have." Mr. Alley explained that he had kidney stones in the past and that he never thought the medicine was for gout. Mr. Alley thought the medication had been prescribed for kidney stones. Stewart advised Mr. Alley that the medical records show that Mr. Alley had a gout flare-up in 1998. Mr. Alley stated that he did not remember the 1998 flare-up.

{¶ 16} The parties then discussed the application process. Mr. Alley stated that "the guy

who sold him the policy misled him. [Mr. Alley] said he thought only the medical stuff that was a problem that year or the last year was all that needed to be put down.   This is how he answered the questions."   Stewart then read the statement on the MHQ that requires the applicant(s) to report conditions that the applicant(s) has "at any time been treated for or diagnosed as having."

{¶ 17} Stewart asked Mr. Alley if Skaggs read the questions to him. Mr. Alley stated that Skaggs read the questions to him and then filled in the boxes on the MHQ.   Stewart then inquired whether Skaggs had completed the name and address information as well.   Mr. Alley stated that he did not know who completed that information and that Stewart and Ferrara "better talk to [Skaggs] about this."   Mr. Alley advised Stewart and Ferrara that he believed Skaggs "is responsible for the how [sic] things got answered on the MHQ."

{¶ 18} After they spoke with Mr. Alley, Stewart and Ferrara determined that Mr. Alley "was responsible for the way that the application was completed."   Appellant thus decided to terminate the Alleys' policy.

D

THE TERMINATION

{¶ 19} On February 19, 2004, Medical Mutual Executive Vice President George Stadtlander sent the Alleys a letter advising them that appellant was terminating their coverage. Stadtlander wrote:

{¶ 20} "Recently, the Underwriting Compliance Department and Financial Investigations Department of Medical Mutual reviewed documents pertaining to your health insurance policy. Based on the results of this review, it has been determined that there have been misrepresentations made to Medical Mutual regarding past medical history and conditions.

**{¶ 21}** Due to misrepresentation of material facts submitted to Medical Mutual at the time of your enrollment, we are exercising our right to terminate your health insurance coverage with a retroactive date of January 1, 2002, the date of your enrollment.   Medical Mutual will further seek to recover by whatever means available any and all claims payments made under your certificate number as listed above."

**{¶ 22}** On February 23, 2004, Mrs. Alley called Stewart to inquire about the termination letter.   Stewart documented Mrs. Alley's statements in a phone log, part of which stated:   "She said she recalled very clearly sitting down with the broker in their home to sign them up for the insurance and telling him about their medical issues.   She said he asked the questions and they told him the answers, and he filled out the application, and then they signed it."   Mrs. Alley further advised Stewart that they told Skaggs that: (1) Mr. Alley took medication to treat gout; (2) Mr. Alley had problems with his cholesterol levels in the past; (3) Mr. Alley had his prostate checked and it was okay; (4) Mr. Alley had kidney stones about three years ago; and (5) Mr. Alley had heart catheterizations performed but his heart was fine.   Mrs. Alley "emphasized that they told the truth about everything to the best of their knowledge, and she thinks now they are suffering because of what the broker did."   Appellant nevertheless terminated the Alleys' policy.

E

THE ALLEY LITIGATION

**{¶ 23}** The Alleys subsequently filed a complaint against appellant and alleged that after appellant terminated their coverage, the Alleys requested appellant to question appellee or Skaggs concerning the information they provided to Skaggs.   The Alleys claimed that appellant (1) did nothing to confirm that they truthfully advised Skaggs of their medical background and history, (2)

attempted to return $14,935.59 to the Alleys' premium refund and contacted the Alleys' medical providers to demand that they return the payments made for medical services provided to the Alleys, and (3) knew that Skaggs completed the Alleys' insurance application and that the Alleys did not make any willful or fraudulent misstatements regarding their application.

{¶ 24} Consequently, based upon these facts, the Alleys sought a declaratory judgment and asserted several causes of action against appellant: (1) fraud, (2) breach of contract, (3) false light, (4) breach of contract/bad faith, and (5) bad faith/tortious conduct. The Alleys also asserted several causes of action against appellee: (1) negligence, (2) breach of fiduciary duty, and (3) fraud. The Alleys further asserted the following causes of action against Skaggs: (1) negligence, (2) breach of fiduciary duty, and (3) fraud.

{¶ 25} Appellant brought a cross-claim in the Alley litigation against appellee and Skaggs that sought indemnification. Appellant alleged that it "was forced to defend a lawsuit that would not have occurred, if [appellee] had properly instructed the Alleys to fully and accurately complete to the [sic] entire medical health questionnaire and application."

{¶ 26} Eventually, appellant notified appellee that it intended to settle the matter with the Alleys and demanded that appellee indemnify it. Appellant's letter stated that if appellee did not respond on or before March 19, 2007, appellant would proceed to execute the settlement agreement with the Alleys and look to appellee for recovery. Appellee did not respond. Appellant then settled with the Alleys for $70,000.

F

APPELLEE'S DECLARATORY JUDGMENT COMPLAINT

{¶ 27} On March 15, 2007, appellee filed a complaint for declaratory judgment against

appellant and requested the court to declare the parties' rights and obligations under the agency agreement's indemnity provision.

{¶ 28} On April 13, 2007, before appellant filed its answer, appellee requested summary judgment and asserted that the Alleys' claims against appellant did not fall within the scope of the indemnity provision.   Appellee argued that the causes of action all focused upon appellant's independent conduct, not appellee's or Skaggs' conduct for which appellee could be held vicariously liable.   Appellee claimed that the causes of action were based upon appellant's "knowing and intentional conduct" and that indemnification is not available for intentional conduct.

{¶ 29} Appellant's memorandum contra asserted that it is entitled to be indemnified for damages paid to settle the Alleys' lawsuit because (1) it provided proper notice, (2) it is liable for the settled claims, and (3) the settlement is fair and reasonable.   Appellant disputed appellee's claim that the Alleys asserted independent acts of negligence against appellant; rather, appellant asserted that all of the causes of action arose from appellee's agent's alleged misconduct.   Thus, appellant argued that it was only vicariously liable for the Alleys' claims.

{¶ 30} The trial court overruled appellee's motion for summary-judgment and determined that genuine issues of material fact remained.   Appellant then answered and asserted a counterclaim for breach of the agency agreement.   Appellant alleged that appellee breached the agency agreement in the following respects: (1) by failing to indemnify and save appellant harmless from all loss, expense, cost and liability that resulted from appellee's and Skaggs' unauthorized acts and transactions; (2) by failing to comply with appellant's rules and regulations regarding the completion and submission of a health insurance application (i.e., appellee did not

require the Alleys to physically complete the medical health questionnaire contained in the application); (3) by failing to ensure to the best of its ability that the representations that the Alleys set forth were true and correct; and (4) by failing to fully inform the Alleys that appellant's subsequent discovery of material facts that the Alleys knew of and either failed to disclose or misrepresented could result in a rescission or cancellation of their health insurance policy. Appellant requested judgment in the amount of (1) $70,000 for its settlement with the Alleys, and (2) $89,500 for the attorney fees it incurred in the Alley litigation.

{¶ 31} Subsequently, appellee filed a second summary-judgment motion. Appellee pointed out that since it filed the previous motion, it had settled the case with the Alleys. Appellee reiterated that the Alleys' causes of action against appellant did not fall within the scope of the indemnity provision. Rather, appellee asserted that the claims appellant settled with the Alleys related to appellant's own conduct in unilaterally terminating the insurance contract and that appellant did not settle any of the claims the Alleys asserted against appellee or Skaggs. Thus, appellee maintained that appellant could not use the indemnity provision to seek indemnity for its own intentional misconduct.

{¶ 32} In its memorandum contra, appellant noted that the trial court had denied appellee's earlier summary-judgment motion and that appellee's second motion raised no new issues.

{¶ 33} On January 18, 2008, the trial court granted appellee's summary-judgment request and determined that appellee had no obligation to hold appellant harmless, to reimburse appellant, or to indemnify appellant. Although the court did not provide specific reasons in its written decision, at an oral hearing the court stated that "it is inherently unfair for [appellant] to settle a case for which they are potentially liable and then to go back and tell [appellee] to pay us back."

The court also stated that because the parties settled the claims with the Alleys, the court could not

determine the parties' actual liability so as to ascertain whether appellant is entitled to indemnity.

{¶ 34} Appellant appealed the trial court's judgment.   See Portsmouth Ins. Agency v. Med.

Mut. of Ohio, 188 Ohio App.3d 111, 113-115, 2009-Ohio-941, 934 N.E.2d 940, 941 - 943 (Ohio

App. 4 Dist.,2009).   We determined that genuine issues of material fact remained as to whether

appellant's liability to the Alleys resulted from appellee's misconduct or appellant's own

misconduct.   Id. at 24.

## G

## THE TRIAL

{¶ 35} On remand, the trial court held a jury trial regarding appellant's counterclaim for

breach of contract.   Appellant's theory at trial was that appellee breached the indemnity provision

in the agency agreement because it failed to defend it in the Alley litigation, which resulted from

appellee's unauthorized acts or transactions caused its loss.   Appellant asserted that appellee's acts

or transactions regarding the Alleys' application were unauthorized because (1) appellee failed to

comply with appellant's rules and regulations that required the Alleys to personally complete the

MHQ, and instead, Skaggs completed the MHQ, and (2) Skaggs failed to fully explain to the

Alleys the consequences of misrepresentations or non-disclosures.

{¶ 36} During opening statements, appellant's counsel informed the jury that if the Alleys

were telling the truth that they had disclosed all of their medical conditions to Skaggs but that

Skaggs failed to report them, then appellant would be liable to the Alleys for terminating the

policy.   Counsel stated that appellant decided that the Alleys were telling the truth and thus

decided to settle the matter.   Appellant's counsel asserted that the evidence will show that the

Alleys are telling the truth, that Skaggs completed the application, that the Alleys never saw the completed application, and as such, it was appellee's unauthorized acts that resulted in the termination of the Alleys' policy.

{¶ 37} Appellee, on the other hand, claimed that the Alleys were not truthful when they answered Skaggs' questions and that it was the Alleys' failure to tell the truth–not Skaggs' conduct–that caused appellant's loss.   Appellee further attempted to show that it did not receive a copy of appellant's guidelines and, as such, could not be accountable for failing to comply with those particular guidelines.

{¶ 38} At trial, the Alleys and Skaggs testified regarding the circumstances surrounding the December 13, 2001 meeting when the Alleys applied for coverage with appellant.   Not surprisingly, their testimony conflicted, and about the only thing the parties agreed upon was that they met at the Alleys' home on December 13, 2001 and sat at a table.   The Alleys stated that Skaggs arrived at their home around 8:00 p.m. on December 13, 2001.   Skaggs stated that he arrived around 4:30 or 5:00 p.m.   The Alleys testified that Skaggs stayed for maybe one hour and seemed in a hurry to leave because it was getting late.   Skaggs stated that he stayed for maybe two hours and that he was not in a hurry to leave.

{¶ 39} The Alleys claimed that Skaggs did not show them an application and that he took notes on a yellow notepad.   The Alleys testified that Skaggs asked them some medical questions, but he did not ask them the 88 questions that are listed on the MHQ.   Mr. Alley stated that he did not believe that Skaggs had been reading questions from a form and that Skaggs asked some medical questions but "no way near" 88 questions.   Mr. Alley testified: "[Skaggs] asked some questions.   He didn't read no questions to us that evening.   He asked some questions and we

answered the best we could."

{¶ 40} Mr. Alley stated that he told Skaggs that he was taking medication for gout and kidney stones. Mrs. Alley testified that Mr. Alley informed Skaggs that he took medication for high blood pressure and gout. Mr. Alley recognized that the health insurance application contains his blood pressure readings, but stated that he did not know how Skaggs would have received the information.

{¶ 41} The Alleys alleged that Skaggs took notes and that Skaggs advised them that he would complete the application at the office. They stated that he did not complete an application in their presence. Mrs. Alley stated that because it was getting late in the evening, Skaggs told them that he would complete the application later. She claimed that they then signed the application and gave Skaggs a check.

{¶ 42} The Alleys testified that they did not see a tri-fold application and believe Skaggs presented a one-page application to them. Mr. Alley claimed that when Skaggs presented the application for signatures, it was a piece of paper with "nothing * * * else–no other writing on it." Mr. Alley stated that he did not read the application before he signed it. The Alleys further testified that Skaggs did not summarize any part of the application.

{¶ 43} Skaggs, on the other hand, testified that he used appellant's tri-fold application and placed the application on the kitchen table where the parties were seated. Skaggs stated that he did not simply take notes on a yellow notepad. but rather filled in the application based upon the Alleys' responses. He explained that he had not received a copy of the guidelines that stated the applicant must complete the MHQ and that at his prior employment, the insurance agents customarily completed the form based upon the applicant's responses.

{¶ 44} Skaggs testified that he asked the Alleys each of the specific 88 medical questions contained in the MHQ and that after he completed the application, he presented it to the Alleys for review.   Skaggs "told them that * * * the disclaimer that states–you need to read this and review and make sure the health information is true and accurate to the best of your knowledge.   If you agree then you can sign at the circled 'x' at the bottom of the page."   Skaggs admitted, however, that he did not summarize the contents of the terms and conditions page.

{¶ 45} Skaggs testified that he provided the Alleys sufficient time to review the application and that he did not rush them.   He stated that he took the completed application to the office on the next business day and then copied it, along with the Alleys' check that they had given him. Contrary to the Alleys' assertions, Skaggs did not state that he completed the application by himself at the office the next business day.

{¶ 46} Stewart testified regarding his and Ferrara's phone call with Mr. Alley.   He stated that after speaking with Mr. Alley, he did not feel the need to talk to Skaggs because "[w]e had the impression after gathering all the medical history information, talking to a provider, talking to Luther Alley himself; that at that point in time Luther Alley was responsible for the way that the application was completed."   Stewart explained that Mr. Alley never advised Stewart that Mr. Alley had not completed the application.   Stewart further stated that before appellant terminated the Alleys' policy, it did not confer with Skaggs regarding the Alleys' application process.

{¶ 47} Ferrara testified that he also did not "feel it was critical" to speak with Skaggs. Ferrara stated that when the Alleys signed the application, "they represent that they've read the application.   That they understood the questions, and that they were honest and truthful to the best of their abilities."   He was asked, "Actually, they are verifying everything that is written in the

application is true; correct?"  Ferrara responded, "That's what this states."  Ferrara stated that appellant decided to terminate the policy because after investigating, it concluded that Mr. Alley failed to reveal his entire medical history.

{¶ 48} Stadtlander testified that appellant created "Individual Under 65 Field Underwriting Guidelines," which are general guidelines for completing health insurance applications. Stadtlander stated that he was "fairly confident" that these guidelines were in place when the Alleys applied for health insurance.  The guidelines governing the MHQ section of the application state: "Therefore, if an applicant has selected a health plan, he or she must complete this section of the application for him or herself and each dependent applying for coverage."  Stadtlander explained that it was important for the applicant to complete the MHQ "[b]ecause the applicant would be in the best position to represent [his or her] personal information, as well as their health status that was used as a the basis for underwriting."

{¶ 49} Stadtlander admitted that he had no personal knowledge or documentary proof that appellant sent the guidelines to appellee.  He explained: "I have no direct knowledge of that, and it's my belief that it would have been the responsibility of the full service broker to discuss with [appellee] the appropriate procedure, and if [appellee] had any questions, they would talk [to] the representatives from either National Underwriter Brokers and Associated Underwriters[, the full service brokers]."  Stadtlander further conceded that the guidelines do not prohibit an agent from assisting an applicant.  He explained that an agent might assist an individual who is paraplegic or blind but that "there was no specific prohibition against assisting."  Stadtlander then pointed out that regardless of any assistance provided, when the applicant signs the application, the applicant "very clearly" warrants that "'I am signing this * * * Health and Life Application on my own

behalf and on behalf of all listed dependents.'"

{¶ 50} Stadtlander testified that he thought Mr. Alley seemed like an honest person and that when he spoke with Mr. Alley, he asked Mr. Alley "if [Skaggs] read him the questions or how it was done.   He said [Skaggs] read the questions to him and [Skaggs] filled in the boxes on the MHQ."

{¶ 51} Portsmouth Insurance Agency Secretary-Treasurer Gary Duzan testified that he signed the agency agreement with appellant.   He stated that National Underwriter Brokers [NUB] provided appellee with information from appellant, but that appellee never received a copy of the guidelines.   He testified that neither NUB nor Associated Underwriters [AU] sent a copy of the guidelines to appellee.   Duzan explained that appellee receives information from NUB "probably monthly" and that NUB also posts documents on its website.

{¶ 52} NUB's Steven Davis testified that NUB passed along information it received from insurance companies to the writing agents either by faxing, mailing, emailing, or posting to its website.   Davis does not specifically recall receiving a copy of appellant's guidelines, but stated that they are the type of information appellant would send.   When asked who would have been responsible for sending out the guidelines, Davis responded:   "Well, because of the size of this, we would not have mailed this to every agent.   Medical Mutual does their own communications. We try to determine whether this has already been sent to agents directly from Medical Mutual. Probably something of this size would warrant us to have some sort of meeting to go over changes, but it's hard to say.   We may have had a conversation with Medical Mutual and they say, 'We've sent this out already' or 'We're holding a separate meeting ourselves', there's lots of ways insurance companies communicate to the field force, so but we may–we certainly have this

available to agents, but we would not–I don't recall mailing out this size of a document."   Davis does not recall a specific meeting that he held to discuss the guidelines, but he states that it is possible that there was one.

{¶ 53} After hearing the evidence and counsels' arguments, the jury returned a verdict in appellee's favor.   When reaching its verdict, the jury answered the following interrogatories:

{¶ 54} Jury Interrogatory Number 1: "Do you find that Medical Mutual has proven, by a preponderance of the evidence, that Todd Skaggs failed to include all the medical conditions disclosed by the Alleys to him on the medical history questionnaire submitted to Medical Mutual?"  The jury answered, "No."

{¶ 55} Jury Interrogatory Number 2: "Do you find that Medical Mutual has proven, by a preponderance of the evidence, that Todd Skaggs failed to fully inform the Alleys that the subsequent discovery by Medical Mutual of material facts known by the Alleys and either not disclosed or misrepresented on the application could result in the rescission or cancellation of the Alley's [sic] health insurance policy?"   The jury answered, "Yes."

{¶ 56} Jury Interrogatory Number 3: "Do you find that Medical Mutual has proven, by a preponderance of the evidence, that it would have been liable to the Alleys for breach of contract?"  The jury answered, "No."

{¶ 57} Jury Interrogatory Number 4: "Do you find that Medical Mutual has proven, by a preponderance of the evidence, that it would have been liable to the Alleys for the bad faith of their medical claims?"   The jury answered, "Yes."

{¶ 58} Jury Interrogatory Number 5: "Do you find that Medical Mutual has proven, by a preponderance of the evidence, that its settlement with the Alleys was fair and reasonable?"   The

jury answered, "No."

{¶ 59} Jury Interrogatory Number 6: "Do you find that Medical Mutual has proven, by a preponderance of the evidence, that the Alleys' claim against Medical Mutual resulted from an unauthorized act of Portsmouth Insurance or its agent Todd Skaggs?"   The jury answered, "No."

{¶ 60} Special Interrogatory Number 1: "Do you find by a preponderance of the evidence that Todd Skaggs asked the questions on the application, the Alleys provided the answers and Todd Skaggs checked the boxes in accordance with their answers?"   The jury answered, "Yes."   Then: "If yes to above, do you find by a preponderance of the evidence that Todd Skaggs filling in the application for the Alleys violated Medical Mutual's rules and regulations, and did that violation cause damage to Medical Mutual?"   The jury answered, "No."

{¶ 61} Special Interrogatory Number 2: "Has Medical Mutual proven by clear and convincing evidence that Todd Skaggs recorded false answers contrary to answers the Alleys gave him about their medical history when completing the application Luther and Donna Alley signed on December 13, 2001, to get a policy of insurance with Medical Mutual?"   The jury answered, "No."

{¶ 62} The trial court entered judgment in favor of appellee.

H

APPELLANT'S POST-TRIAL MOTIONS

{¶ 63} On September 7, 2004, appellant filed a motion for judgment notwithstanding the verdict (JNOV) and, alternatively, a new trial motion.   Appellant alleged that the uncontroverted evidence shows that appellee breached the agency agreement.   Appellant asserted that the evidence indisputably demonstrates that Skaggs breached the agreement by not requiring the Alleys

to complete the application by themselves and by not informing the Alleys that the subsequent discovery by appellant of material facts known to the Alleys and either not disclosed or misrepresented on the application could result in the rescission or cancellation of the Alleys' health insurance. Appellant argued that the clear evidence of appellee's breach of the agency agreement entitled it to recover its attorneys fees. Appellant contended that the indemnification provision required appellee to defend appellant against the Alleys' lawsuit because their lawsuit arose out of Skaggs' allegedly unauthorized conduct. Appellant asserted that even though the jury apparently found that Skaggs' unauthorized conduct did not cause appellant's $70,000 loss as a result of appellant's settlement with the Alleys', the mere fact that the Alleys alleged in their complaint that Skaggs and appellee engaged in unauthorized acts or transactions required appellee to defend appellant. Appellant argued that appellee's failure to comply with the indemnification provision caused it to incur attorney fees when defending the Alley litigation and attorney fees when seeking to enforce its indemnity rights in the present litigation.

{¶ 64} Appellant alternatively argued that it was entitled to a new trial. Appellant contended that the jury's finding that appellee did not breach the indemnification clause is against the manifest weight of the evidence and contrary to law. Appellant asserted that the jury ignored "uncontroverted evidence that [appellee] breached the indemnification provision by not providing [appellant] with a defense against the Alleys' lawsuit." Appellant claimed that appellee "had a contractual duty to indemnify [appellant] against any loss, expense or costs or liability resulting from its unauthorized acts or transactions." Appellant additionally argued that "even if [appellant] was not entitled to recover the amount it paid to settle the Alleys' lawsuit, it was still entitled to recover for [appellee's] failure to defend it." Appellant essentially contended that appellee's

breach of the agency agreement triggered appellee's obligations under the indemnification provision, regardless of whether appellee's breach caused appellant's loss, expense, costs, or liability. Appellant argued that the jury's "failure to consider a class of damages and award [appellant] damages based upon admitted breach of the Agency Agreement requires the award of a new trial."

{¶ 65} In opposition, appellee asserted that the indemnification provision did not require appellee to defend appellant. Appellee claimed that the indemnification provision did not require it to indemnify appellant unless it was determined that appellant's loss resulted from appellee's unauthorized acts or transaction. Appellee pointed out that the jury determined in its interrogatories that appellant's loss did not result from appellee's unauthorized acts or transactions. Appellee thus argued that appellant was not entitled to recover from appellee its costs in defending the Alley litigation. Appellee asserted that its duty to indemnify appellant never ripened because there is no evidence that Skaggs' conduct caused appellant to terminate the Alleys' policy. Appellee noted that both Stewart and Ferrara testified that they never spoke with Skaggs before appellant decided to terminate the Alleys' policy, and thus implied that appellant could not have terminated the policy based upon Skaggs' conduct when appellant admittedly failed to investigate what Skaggs may or may not have done.

{¶ 66} In reply, appellant asserted that appellee "fail[ed] to comprehend [appellant's] theory of the case." Appellant argued that the Alleys' lawsuit against it directly resulted from Skaggs' unauthorized acts, i.e., his failure to require the Alleys to complete the MHQ on their own and his failure to advise the Alleys of the consequences of misrepresenting or failing to disclose all of their health conditions. Appellant argued that if Skaggs had not engaged in these unauthorized

acts, then the Alleys would not have instituted the lawsuit against appellant.   It claimed: "Had the application been completed by the Alleys themselves, and not by Skaggs, it would have been impossible for the Alleys to claim that Skaggs put down the wrong information.   Thus, had [appellee] complied with its other contractual obligations, it would have been apparent that [appellant] was entitled to rescind the contract based upon the Alleys['] handwritten misrepresentations."   Appellant contended that appellee "could have prevented [the Alleys litigation] * * * by complying with [appellant's] rules and regulations."

{¶ 67} Appellant further asserted that the indemnity agreement required appellee to indemnify it for attorney fees.   Appellant posited: "Where one party agrees to hold the other harmless from all claims and judgments, that necessarily includes attorney fees incurred defending against such claims.   If [appellant] has to pay $89,500 in attorney fees to defend against a lawsuit that [appellee] could have prevented by complying with the Agency Agreement, [appellant] has not been held harmless.   It has been damaged as a result of [appellee's] breach, and it is entitled to compensation."

{¶ 68} On November 19, 2010, the trial court overruled appellant's JNOV motion and new trial motion. This appeal followed.

III

JNOV MOTION

{¶ 69} In its first assignment of error, appellant asserts that the trial court erred by denying its JNOV motion.   Although appellant's arguments are not entirely clear, we have outlined what we perceive to be the arguments contained in its first assignment of error.

{¶ 70} Appellant's basic assertion is that the trial court should have granted it a JNOV

because the jury failed to award appellant damages for the attorney fees it incurred when defending the Alley litigation.   Appellant apparently does not contend that the court should have granted it a JNOV regarding the jury's verdict concerning the settlement amount it paid to the Alleys, $70,000. Rather, appellant appears to dispute only whether the jury should have awarded it $89,500 in damages for the attorney fees it incurred when defending the Alley litigation.

{¶ 71} Appellant asserts that the indemnity agreement required appellee to defend appellant immediately upon the filing of the Alleys' complaint, regardless of whether appellant or appellee would be ultimately liable to the Alleys.   Appellant contends that appellee's failure to defend it immediately upon the filing of the Alleys' complaint constitutes a breach of the indemnity provision.   Appellant claims that appellee's failure to defend it caused appellant to incur legal fees and costs in defending the Alley litigation and in pursuing the present litigation.   Appellant thus seeks indemnification from appellee for these costs.

{¶ 72} Appellant further observes that the indemnity agreement requires appellee to indemnify and save appellant harmless from all loss, expense, cost and liability resulting from appellee's unauthorized acts or transactions.   Appellant claims that uncontroverted evidence shows that Skaggs engaged in unauthorized acts by failing to comply with two requirements contained in the agency agreement: (1) Skaggs failed to fully inform the Alleys of misrepresenting or failing to disclose all of their medical conditions; and (2) Skaggs completed the MHQ on the Alleys' behalf.   Appellant further asserts that Skaggs' unauthorized acts caused it to suffer losses, expenses, and costs when defending the Alley litigation.   Appellant claims that appellee's failure to indemnify it for those losses, expenses, and costs constitutes a breach of the indemnity provision.

{¶ 73} Appellant argues that uncontroverted evidence exists that Skaggs engaged in an unauthorized act by failing to comply with the agency agreement requirement to fully inform the Alleys that appellant would rely solely upon their representations regarding their medical conditions and that appellant's subsequent discovery of material facts that the Alleys failed to disclose or misrepresented on the application could result in the rescission or cancellation of their policy. Appellant points out that Skaggs admitted that he did not fully comply with the foregoing requirement. Appellant argues that Skaggs' admitted conduct constitutes a breach of the agency agreement and thus also constitutes an unauthorized act.

{¶ 74} Appellant then contends that Skaggs' unauthorized act caused it to incur the Alley litigation attorney fees. Appellant claims that Skaggs' unauthorized act directly caused it to incur attorney fees in the Alley litigation. Appellant suggests that Skaggs' failure to warn the Alleys about the consequences of misrepresenting or failing to disclose all of their health conditions "made it more likely that [the] Alleys would do just that in an attempt to lower their premiums." Appellant thus argues that if Skaggs had not breached this provision of the agency agreement, then the Alleys would not have had a basis to file a lawsuit against appellant.

{¶ 75} Appellant further contends that the uncontroverted evidence reveals that Skaggs engaged in an unauthorized act by failing to comply with the agency agreement's rules and regulations. Appellant asserts that its rules and regulations required the Alleys to complete the MHQ without Skaggs' assistance. Appellant notes that neither Skaggs' nor appellee has disputed that Skaggs completed the MHQ on the Alleys' behalf. Appellant argues that Skaggs' failure to require the Alleys to complete the MHQ without his assistance constitutes a breach of the agency agreement and thus also constitutes an unauthorized act.

{¶ 76} Appellant next contends that Skaggs' failure to require the Alleys to complete the MHQ without his assistance caused appellant to incur the Alley litigation attorney fees.  Appellant claims that if Skaggs had not engaged in this unauthorized act, then the Alley litigation "could have been avoided."  Appellant alleges that Skaggs' "unauthorized act of completing the [MHQ] * * * for the Alleys directly led to [appellant's] inclusion in the [Alley litigation]."  Appellant asserts that "[b]y completing the application[] for the Alleys, Skaggs created the opportunity for the Alleys to claim Skaggs failed to include information which they had disclosed to him."

{¶ 77} In response, appellee first points out that appellant "never presented any evidence to the Jury as to attorney's fees, never requested Jury instructions on attorney fees as an item of damages and never filed any motion or requested any hearing by the Trial Court on any claim for attorney's fees after the verdict was returned."  Appellee further contends that the language contained in the indemnity provision does not include a duty to defend and does not entitle appellant to its attorney fees.  Appellee then argues that even if the indemnity provision provides for a duty to defend and entitles appellant to its Alley litigation attorney fees, the provision further requires that appellant's loss result from appellee's (Skaggs') unauthorized conduct.  Appellee asserts that the evidence supports the jury's finding that Skaggs did not engage in an unauthorized act that caused appellant's loss.  Appellee notes that two of appellant's employees, Stewart and Ferrara, testified that they decided to terminate the Alleys' policy once they determined that the Alleys had not fully disclosed all of Mr. Alley's medical conditions.  Appellee appears to assert that Stewart's and Ferrara's testimony demonstrates that appellant's loss occurred the moment it decided to terminate the Alleys' policy and not at the moment the Alleys filed their lawsuit. Appellee thus argues that appellant's decision to terminate the policy, not Skaggs' allegedly

unauthorized conduct, immediately caused appellant's loss and directly gave rise to the Alley litigation.

{¶ 78} In reply, appellant reiterates its assertion that Skaggs engaged in unauthorized acts by breaching the agency agreement and further attempts to link his breaches to its loss. Appellant suggests that Skaggs' failure to fully advise the Alleys of the consequences of misrepresentations or non-disclosures caused the Alleys to inaccurately report their health information. Appellant proposes that its costs of defending the Alley litigation resulted from this failure. Appellant further argues that Skaggs' failure to require the Alleys to complete the MHQ proximately caused its loss. Appellant explains: "The Alleys' health information on the application submitted to [appellant] was undisputedly incomplete. Had the Alleys completed the application themselves, as [appellant's] guidelines require, they would have been bound by the information provided on the application. Instead, in violation of [appellant's] rules and regulations, Skaggs completed the application, which allowed the Alleys to later argue that Skaggs had failed to record everything that the Alleys disclosed. But for Skaggs' violation of the rules and regulations, the Alleys' case would not have been brought because they would have had no choice but to admit that they lied to obtain coverage in the first place." Appellant basically asserts that if appellee had not breached any provisions of the agency agreement, then the Alleys would have had no basis to institute a lawsuit against appellant. Appellant argues that appellee's breach "made it more likely that the Alleys would make misrepresentations and created an opportunity for them to bring suit contending that Skaggs had failed to accurately record the information provided to him."

A

STANDARD OF REVIEW

{¶ 79} A JNOV motion presents a question of law that an appellate court reviews independently and without deference to the trial court. Environmental Network Corp. v. Goodman Weiss Miller, L.L.P., 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶¶22 & 23, citing O'Day v. Webb, 29 Ohio St.2d 215, 280 N.E.2d 896 (1972), paragraph three of the syllabus. A trial court may not grant a JNOV motion if the evidence, construed most strongly in favor of the non-moving party, is legally sufficient to sustain the verdict. Environmental Network at ¶23, citing Osler v. Lorain, 28 Ohio St.3d 345, 347, 504 N.E.2d 19 (1986). Thus, "a motion for a [JNOV] must be denied when 'substantial, competent evidence has been presented from which reasonable minds could draw different conclusions.'" Kroh v. Continental Gen. Tire, Inc., 92 Ohio St.3d 30, 31, 748 N.E.2d 36 (2001). Conversely, when a court determines, after construing the evidence most strongly in the non-moving party's favor, that reasonable minds could come only to a conclusion adverse to the non-moving party, the court must grant a JNOV. Posin v. A.B.C. Motor Court Hotel, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976). Moreover, when a court considers a JNOV motion, the court cannot consider either the weight of the evidence or the credibility of the witnesses. Osler at syllabus; Posin, 45 Ohio St.2d at 275; O'Day.

B

BREACH OF CONTRACT

{¶ 80} In the case at bar, the jury returned a verdict against appellant regarding its breach of contract claim. Thus, to determine whether the trial court improperly denied appellant's JNOV motion, we must examine whether reasonable minds could reach only the conclusion that appellee breached the contract.

{¶ 81} To prevail on a breach of contract claim, the claimant must demonstrate each of the

following: (1) the existence of a contract; (2) performance by the claimant; (3) breach by the

opposing party; and (4) damage or loss to the claimant that resulted from the opposing party's

breach.   E.g., Spectrum Benefit Options, Inc. v. Medical Mut. Of Ohio, 174 Ohio App.3d 29,

2007-Ohio-5562, 890 N.E.2d 926, ¶25.   Thus, in order to reverse the trial court's denial of

appellant's JNOV motion, the evidence in the record must show that the jury could reach only one

conclusion regarding each of the following elements: (1) the existence of a contract; (2)

performance; (3) breach; (4) causation; and (5) damages.

{¶ 82} In the case sub judice, appellant contends that the evidence reveals that the jury

could have reached only one conclusion regarding its claim that appellee breached the indemnity

provision by failing to defend appellant in the Alley litigation.   Appellant thus asserts that the

evidence does not support the jury's verdict that failed to award it damages for appellant's Alley

litigation attorney fees.

C

BREACH

{¶ 83} Whether appellee breached the indemnity provision turns upon what we perceive to

be three essential questions: (1) whether the indemnity provision contains a duty to defend that

obligated appellee to defend appellant immediately when the Alleys filed their complaint; (2)

whether appellee engaged in an unauthorized act; and (3) whether appellee's unauthorized act

resulted in appellant's attorney fees.   The problems with answering these questions are manifold.

{¶ 84} First, appellant's first assignment of error presupposes that the indemnity provision

contains a duty to defend that obligates appellee to indemnify it for attorney fees.   Appellant,

however, never sought a ruling from the trial court as to whether the language contained in the

indemnity provision includes a duty to defend and allows appellant to recover the Alley litigation attorney fees.

**{¶ 85}** It is a cardinal rule of appellate procedure that a party cannot assert new legal theories for the first time on appeal.   See Stores Realty Co. v. Cleveland, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975); Mark v. Mellott Mfg. Co., Inc., 106 Ohio App.3d 571, 589, 666 N.E.2d 631 (1995).   "Litigants must not be permitted to hold their arguments in reserve for appeal, thus evading the trial court process."   Mellott Mfg. Co., 106 Ohio App.3d at 589.   As such, a reviewing court will not consider any issue a party failed to raise in the trial court, but instead, will consider the issue waived.   E.g., Lippy v. Society Natl. Bank, 88 Ohio App.3d 33, 40, 623 N.E.2d 108 (1993).

**{¶ 86}** In the case at bar, because appellant failed to seek a ruling from the trial court regarding whether the indemnity provision includes a duty to defend, appellant cannot raise the argument on appeal.   Furthermore, as a reviewing court we cannot consider this issue in the first instance.   Sites v. Sites, 4th Dist. No. 09CA19, 2010–Ohio–2748, ¶30; Lang v. Holly Hill Motel, Inc., 4th Dist. No. 05CA6, 2005–Ohio–6766, at ¶22, citing Murphy v. Reynoldsburg, 65 Ohio St.3d 356, 360, 604 N.E.2d 138 (1992) (stating that "we, as an appellate court, should not first consider an argument that the trial court did not address").

**{¶ 87}** Additionally, appellant did not request the trial court to instruct the jury regarding the legal ramifications of the indemnity provision.   In its JNOV motion, appellant stated: "Under an indemnification and hold harmless provision * * *, an indemnitor may be obligated to pay three distinct costs incurred by the indemnitee: (1) the costs of defending the suit; (2) any costs incurred as a result of a judgment or settlement; and (3) the costs incurred in prosecuting an indemnification

action to vindicate the indemnitee's rights under the indemnification provisions." Appellant then asserted that "there is no question that the allegations included in the Alleys' complaint triggered the Agency Agreement provision requiring [appellee] to defend [appellant]." Appellant did not raise this issue before the jury, and did not request the court to instruct the jury regarding the costs it might be entitled to under the hold harmless provision. Curiously, however, appellant did raise this issue in its trial brief. Because this issue was not before the jury, we must conclude that this argument has been waived.

{¶ 88} Next, as appellee points out, appellant did not present any argument to the court or to the jury that the jury could consider its Alley litigation attorney fees as a separate element of damages. Rather, appellant appears to have taken an all-or-nothing approach. During the trial court proceedings, appellant did not argue that the jury could find in appellee's favor regarding the Alley settlement costs, but in appellant's favor regarding the Alley litigation attorney fees.

{¶ 89} Civ.R. 51(A) states:

> On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.

{¶ 90} In the case sub judice, appellant did not request the trial court to instruct the jury that it could award appellant the Alley litigation attorney fees, even if the jury determined appellee was not obligated to indemnify it for the settlement costs. Moreover, the court's jury instructions did not advise the jury that it could return a verdict for appellee regarding its duty to indemnify appellant for the settlement costs of the Alley litigation, but return a verdict in appellant's favor regarding appellee's duty to indemnify appellant for its attorney fees in the Alley litigation. The

jury instructions read, in part:

> "Before you can find for [appellant] on the counterclaim, you must find by the greater weight of the evidence that[:] (A) [Appellant] gave [appellee] proper and timely notice of the Alleys' claims and [appellant's] intent to settle that claim; (B) [appellant] was legally liable to respond to the Alleys' claim; (C) [appellant's] settlement with the Alley's [sic] was fair and reasonable; and (D) The Alley's [sic] claims resulted from an unauthorized act of [appellee] or its agent, Todd Skaggs. * * * *
>
> [Appellant] contends, as a result of the unauthorized acts of [appellee] and Todd Skaggs, it was legally liable to the Alley's [sic] for breach of contract.  In order to find that [appellant] was legally liable to the Alley's [sic] for breach of contract, you must find by the greater weight of the evidence that[:] (A) [Appellant] entered into a contract with the Alley's [sic] to provide health insurance to the Alley's in exchange for monthly premium payments; and (B) [appellant] broke the contract by rescinding the Alley's [sic] insurance policy and refusing to pay their medical claims on the basis that the Alley's [sic] had failed to disclose their full medical history, when the Alley's had in fact disclosed all their relevant health conditions to Todd Skaggs.  Under Ohio law, in any lawsuit filed by the Alley's against [appellant], the jury would have to assume that [appellant] was aware of any facts disclosed by the Alley's to Todd Skaggs; and (C) The Alley's [sic] had substantially performed their duties under the contract by disclosing their full medical histories and paying all premium due.
>
> [Appellant] also contends that, as a result of the unauthorized acts of [appellee] and Todd Skaggs, it was legally liable to the Alley's for bad faith denial of the Alley's medical claims.  An[] insurer, such as [appellant], fails to exercise good faith in the processing of a claim of its insured where the refusal to pay the claim is not reasonably justified. [Appellant] contends that, if Todd Skaggs did not put–put the Alley's [sic] medical conditions on the insurance application, then [appellant] would be held to know what Skaggs knew.  Because of that, [appellant] would had–have lacked a reasonable justification for refusing to pay the Alley's [sic] claims while claiming that the Alley's [sic] failed to disclose their health conditions on their application.  If [appellant] was found to have denied the Alley's [sic] claims in bad faith, the Alley's [sic] may have been awarded against [appellant] to punish it for this conduct [sic].
>
> [Appellant] settled the Alley's [sic] claim against it for $70,000. [Appellant] contends this was fair and reasonable in light of the Alley's [sic] $56,000 in medical bills and the possibility [appellant] would have to pay the Alleys' attorneys' fees, as well as punitive damages because of the unauthorized acts of [appellee] and Todd Skaggs.
>
> [Appellant] claims that [appellee] and its agent Todd Skaggs acted without authorization when Skaggs completed the Alleys' application instead of the Alleys,

which was in violation of [appellant's] rules and regulations. [Appellee] and Skaggs also failed to ensure that the representations set forth in the Alleys' application were true and correct, and they did not inform the Alleys that the failure to disclose material facts about their health could lead to rescission or cancellation of any policy issued.

You will return a verdict for [appellant] if you find by the greater weight of the evidence that Todd Skaggs, while visiting the [Alleys] in their home, failed to properly record information about [the Alleys'] medical histories on the applications they signed to get a medical insurance policy from [appellant], or if you find that Todd Skaggs's actions were unauthorized acts under the agreement between [appellant] and [appellee].

On the other hand, you will return a verdict to [appellee] if you find by the greater weight of the evidence that Todd Skaggs, while visiting [the Alleys] in their home, properly recorded information about [the Alleys'] medical histories on the application they signed to get a medical insurance policy from [appellant]."

**{¶ 91}** Appellant had an opportunity to review the jury instructions. In fact, when appellee's counsel raised an issue with the instructions after the trial court had instructed the jury, the court noted that the court had asked the attorneys "to preview [the instructions] at least a half a dozen times." Additionally, the court's jury instructions largely tracked the instructions appellant proposed. There is nothing in the record to show that appellant requested the court to instruct the jury that it could enter a judgment in its favor for the defense costs of the Alley litigation even if it found appellant was not entitled to be indemnified for its settlement costs. Moreover, during closing arguments, appellant did not argue to the jury that it could find appellee not obligated to indemnify it for the settlement costs, but obligated to indemnify it for its attorney fees. The first time appellant specifically asserted that the jury could award appellant its attorney fees without awarding appellant its settlement costs was in its JNOV motion. Appellant did not expressly argue to the jury that appellee breached the indemnity provision by failing to defend it in the Alley litigation.

**{¶ 92}** Consequently, because appellant did not bring this issue to the trial court's and the

jury's attention, we conclude that the issue has been waived. Appellant did not request the court or the jury to consider whether it could be entitled to indemnity for its attorney fees but not for its settlement costs.

{¶ 93} Moreover, even without the above problems, we believe that appellant is simply incorrect to assert that uncontroverted evidence exists that appellee engaged in an unauthorized transaction that caused appellant's loss. If we assume that the indemnity clause required appellee to defend appellant, the clause further stated that appellee was required to indemnify appellant when the loss resulted from appellee's unauthorized acts or transactions. The indemnity provision does not impose a duty upon appellee to defend (assuming there is such a duty) unless appellee engaged in an unauthorized act that caused appellant's loss. Thus, appellant must show not only that appellee (i.e., Skaggs) engaged in an unauthorized act(s), but it must also demonstrate that the unauthorized act(s) caused it to incur the Alley litigation costs.[1]

{¶ 94} "It is axiomatic that damages must be the natural and proximate result of the defendant's breach. Indeed, a contracting party is at liberty to breach his contract, being liable only for damages proximately resulting from the breach." Mills v. Best Western Springdale, 10th Dist. No. 08AP-1022, 2009-Ohio-2901, ¶13. Accord Meyer v. Chieffo, 193 Ohio App.3d 51, 2011-Ohio-1670, 950 N.E.2d 1027, ¶34; Sorensen v. Wise Management Services, Inc., 8th Dist. No. 81627, 2003-Ohio-767, ¶39. Thus, a breaching party is liable only for damages that are ""'"the natural and probable consequence[s] of" the alleged breach."'"" Sutowski v. Eli Lilly & Co., 82

---

[1] We observe that on appeal, the parties have addressed this issue as a question of proximate cause. During the trial court proceedings, however, neither party expressly raised a proximate cause issue. Neither party requested the trial court to give the jury a proximate cause instruction. Instead, the parties relied upon the plain language of the indemnity agreement that appellant's loss must "result from" appellee's unauthorized act. For the sake of argument, we nonetheless consider this as a proximate cause question.

Ohio St.3d 347, 351, 696 N.E.2d 187 (1998), quoting Foss-Schneider Brewing Co. v. Ulland, 97

Ohio St. 210, 218, 119 N.E. 454 (1918), quoting Miller v. Baltimore & Ohio Southwestern RR.

Co., 78 Ohio St. 309, 325, 85 N.E. 499 (1908).   Moreover, in the absence of "circumstances [that]

clearly indicate an obvious cause and effect relationship [or lack thereof]," "the issue of proximate

cause is ordinarily one for determination by the jury."   Ornella v. Robertson, 14 Ohio St.2d 144,

151, 237 N.E.2d 140 (1968).   Accord Strother, 67 Ohio St.2d 282, 288, 423 N.E.2d 467 (1981).

{¶ 95} Because proximate cause is ordinarily a jury question, unless the evidence in the

case sub judice demonstrates a clear cause-and-effect relationship between appellee's unauthorized

acts and appellant's loss, we may not disturb the jury's verdict.   Here, we do not believe that the

evidence establishes a clear cause-and-effect relationship.   Instead, the record contains

cause-and-effect evidence upon which reasonable minds might disagree.

{¶ 96} In the case sub judice, the jury heard evidence from appellant's own witnesses that

appellant decided to terminate the policy once it concluded that the Alleys were not truthful when

completing the health insurance application.   At that point, appellant had not investigated whether

Skaggs engaged in unauthorized acts or transactions.   Mr. Alley stated that he advised appellant's

employees to speak with Skaggs.   Mr. Alley further informed the employees that Mr. Alley

believed that Skaggs misled him.   Instead of completely investigating Mr. Alley's claims,

appellant concluded that Mr. Alley failed to disclose all of his medical conditions and terminated

the policy.

{¶ 97} From the foregoing facts, the jury may have reached various conclusions.   The jury

may have determined that if appellant had investigated the circumstances surrounding the Alleys'

application process, appellant may have decided not to terminate the Alleys' policy, in which event

the Alley litigation may have been unnecessary. The jury may have concluded that appellant prematurely terminated the Alleys' policy without fully investigating the facts and circumstances surrounding the Alleys' application procedure. The jury could have theorized that the damage to the Alleys was complete at the moment appellant terminated the Alleys' policy, which then provided the Alleys with a basis to bring a lawsuit, regardless of its merits. Thus, the jury could have determined that it was appellant's own conduct that caused the Alleys to file their lawsuit. Consequently, contrary to appellant's argument, we believe that the evidence fails to unequivocally demonstrate that the Alleys would not have instituted their lawsuit but-for Skaggs' alleged unauthorized act. Rather, the record contains some evidence to support a finding that appellant's premature termination of the Alleys' policy caused it to incur the Alley litigation attorney fees.

{¶ 98} Thus, even if appellant had not waived its argument that the jury could have awarded it the Alley litigation attorney fees, the record contains some evidence to support the jury's finding that appellant's loss did not result from appellee's unauthorized act.

{¶ 99} We recognize that the parties argue whether Skaggs did, in fact, engage in an unauthorized act. We believe, however, that we can resolve appellant's assignment of error without necessarily determining whether the record contains sufficient evidence to support the jury's finding regarding Skaggs' conduct. Instead, as we have explained above, even if Skaggs engaged in alleged unauthorized acts, the record contains evidence, upon which reasonable minds might disagree, that Skaggs' alleged unauthorized acts did not result in appellant's Alley litigation attorney fees.

{¶ 100} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's first assignment of error.

IV

CIV.R. 59(A)(7) NEW TRIAL MOTION

**{¶ 101}** In its second assignment of error, appellant asserts that the trial court erred by denying its new trial motion. Appellant argues that the jury's verdict is contrary to law under Civ.R. 59(A)(7) because it did not properly apply contract law because it determined that Skaggs engaged in an unauthorized act, yet failed to find that appellee was obligated to indemnify appellee for the Alley litigation attorney fees. Appellant contends that the evidence clearly shows that appellee engaged in an unauthorized act when Skaggs failed to inform the Alleys of the consequences of misrepresenting or failing to disclose all of their health conditions and when Skaggs completed the MHQ section of the Alleys' application. Appellant argues that these unauthorized acts automatically triggered the indemnification provision and required appellee to indemnify appellant for its Alley litigation attorney fees.

**{¶ 102}** Civ.R. 59(A)(7) allows a court to grant a new trial if the judgment is contrary to law. When a party asserts that a judgment is contrary to law pursuant to Civ.R. 59(A)(7), the question presented is one of law which requires a review of facts and evidence; it does not involve a consideration of the weight of the evidence or credibility of the witnesses. See Pangle v. Joyce, 76 Ohio St.3d 389, 391, 667 N.E.2d 1202 (1996), citing O'Day v. Webb (1972), 29 Ohio St.2d 215, 280 N.E.2d 896, paragraph two of the syllabus. Thus, a court reviewing a trial court's decision regarding a Civ.R. 59(A)(7) new trial motion is to decide whether the trial court erred as a matter of law. Pangle, 76 Ohio St.3d at 391; Rohde v. Farmer, 23 Ohio St.2d 82, 262 N.E.2d 685 (1970), paragraph two of the syllabus; Ferguson v. Dyer, 149 Ohio App.3d 380, 2002-Ohio-1442, 777 N.E.2d 850, ¶11.

{¶ 103} In the case sub judice, appellant claims that the jury's verdict is contrary to contract law. To show that the jury's verdict is contrary to contract law, appellant must establish that the jury improperly applied the following well-established principles of contract law: "[A] breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach." Garofalo v. Chicago Title Ins. Co., 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (1995). Accord Spectrum Benefit at ¶25; All Star Land Title Agency, Inc. v. Surewin Invest., Inc., 8th Dist. No. 87569, 2006-Ohio-5729, ¶19.

{¶ 104} Appellant's basic premise is that because the jury found that Skaggs engaged in an unauthorized act, it should have determined that appellee breached the indemnity provision and awarded appellant damages. Appellant's premise, however, overlooks the causation element contained in the indemnity provision. As we previously stated, for appellee to have breached the indemnity provision, the evidence must show that appellee engaged in an unauthorized act that resulted in appellant's loss. Simply because appellee engaged in an unauthorized act does not mean that the unauthorized act resulted in appellant's loss. The jury obviously determined that even if Skaggs did engage in an unauthorized act, that act did not result in appellant's loss. The record contains nothing to suggest that the jury failed to properly apply contract law.

{¶ 105} Moreover, as we explained in our discussion of appellant's first assignment of error, causation is generally a jury question and obviously was in the case sub judice. The jury resolved the causation issue in appellee's favor. The jury did not improperly apply contract law. Instead, it appropriately determined that even if appellee engaged in an unauthorized act, that act

did not cause appellant's damages. Thus, because appellant apparently failed to prove to the jury

that its loss resulted from appellee's unauthorized act, the jury properly determined that appellee

did not breach the indemnity provision. We therefore disagree with appellant that the jury's

verdict is contrary to law.

**{¶ 106}** Furthermore, we cannot fault the jury for failing to award appellant its Alley

litigation attorney fees when appellant did not request the court to instruct the jury that it could do

so, even if the jury found that appellant was not entitled to indemnification for the Alley settlement

costs. The jury cannot improperly apply law that it was not told to apply.

**{¶ 107}** Accordingly, based upon the foregoing reasons, we hereby overrule appellant's

second assignment of error.

V

CIV.R. 59(A)(6) NEW TRIAL MOTION

**{¶ 108}** In its third assignment of error, appellant asserts that the trial court should have

granted it a new trial because the jury's verdict is against the manifest weight of the evidence.

Appellant claims that the jury's verdict is against the manifest weight of the evidence because the

jury determined that Skaggs engaged in an unauthorized act by failing to fully inform the Alleys of

the consequences of misrepresenting or failing to disclose all of their medical conditions, but it did

not find that appellant was entitled to be indemnified due to Skaggs' unauthorized act. Appellant

also argues that the evidence does not support the jury's finding that appellee did not engage in an

unauthorized act by completing the MHQ on the Alleys' behalf.

**{¶ 109}** Under Civ.R. 59(A)(6), a trial court may grant a new trial if "[t]he judgment is not

sustained by the weight of the evidence * * *." The trial court has broad discretion in deciding

whether to grant a new trial under Civ.R. 59(A)(6), and a reviewing court will not reverse the trial court's decision absent an abuse of that discretion. Wright v. Suzuki Motor Corp., 4th Dist. Nos. 03CA2, 03CA3, and 03CA4, 2005-Ohio-3494, ¶139, citing Pena v. Northeast Ohio Emergency Affiliates, Inc., 108 Ohio App.3d 96, 103, 670 N.E.2d 268 (1995). A court does not abuse its discretion unless it acted unreasonably, arbitrarily or unconscionably. Id.; Blakemore v. Blakemore, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Furthermore, a reviewing court will not reverse a judgment as being against the manifest weight of the evidence when some competent, credible evidence supports the judgment. C.E. Morris Co. v. Foley Construction Co., 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus; Pena, 108 Ohio App.3d at 104.

{¶ 110} When ruling on a Civ.R. 59(A)(6) new trial motion, the trial court must "weigh the evidence and pass on the credibility of the witnesses; not in the substantially unlimited sense that such weight and credibility is passed on originally by the jury, but in the more restricted sense of whether it appears to the trial court that a manifest injustice has been done, and that the verdict is against the manifest weight of the evidence." Rohde at paragraph three of the syllabus. A trial court may not order a new trial based simply on a difference of opinion between it and the jury. Verbon v. Pennese, 7 Ohio App.3d 182, 183, 454 N.E.2d 976 (1982); Poske v. Mergl, 169 Ohio St. 70, 73-74, 157 N.E.2d 344 (1959). The trial court's job is not to judge the credibility of the evidence, but to judge whether the evidence has a "semblance of credibility." Verbon, 7 Ohio App.3d at 183. Because "the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the 'surrounding circumstances and atmosphere of the trial,'" the reviewing court must "view the evidence favorably to the trial court's action rather than to the original jury's verdict." Malone v. Courtyard by Marriott L.P., 74 Ohio St.3d 440, 448, 659

N.E.2d 1242 (1996); Accord Rohde, 23 Ohio St.2d at 94; Wright at ¶140.

{¶ 111} In the case at bar, we do not believe that the trial court abused its discretion by denying appellant's Civ.R. 59(A)(6) new trial motion. The trial court could have reasonably concluded that the jury's verdict did not result in a manifest injustice and that the evidence was sufficiently credible to support the jury's verdict. We have already outlined the evidence that supports the jury's verdict and do not repeat it here. Rather, as we explained in our discussion of appellant's first assignment of error, this case is not so much about whether appellee engaged in an unauthorized act, but rather, whether any unauthorized act that may have occurred caused appellant to incur the Alley litigation attorney fees. We stated in our discussion of appellant's first assignment of error that appellant waived the attorney fee issue by failing to raise it at trial. Furthermore, as we have previously set forth, the evidence supports the jury's determination that any unauthorized act that occurred did not result in appellant's loss. We find nothing in the record that would lead us to believe that the trial court abused its discretion by denying appellant's new trial motion on the basis that the jury's verdict is against the manifest weight of the evidence.

{¶ 112} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's third assignment of error.

VI

CROSS-APPEAL

{¶ 113} Our ruling regarding appellant's assignments of error renders appellee's cross-assignment of error moot. We therefore do not address it.

VII

CONCLUSION

{¶ 114} Having overruled all three of appellant's assignments of error, we hereby affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee/cross-appellant recover of appellant/cross-appellee the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Kline, J. & *Tyack, J.: Concur in Judgment & Opinion

For the Court

BY:_____

Peter B. Abele
Presiding Judge

*Judge George Gary Tyack, sitting by assignment of the Ohio Supreme Court in the Fourth Appellate District.

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the

time period for further appeal commences from the date of filing with the clerk.